UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                              Case No. 1:08-cr-119-2

v.                                                HON. JANET T. NEFF

SURINDER SINGH DHALIWAL,

        Defendant.
_____/

## **OPINION**

Now pending before the Court is Defendant Surinder Singh Dhaliwal's Motion for New Trial (Dkt 357). The government filed a response in opposition (Dkt 360). For the following reasons, the Court denies Defendant's motion.

### I. BACKGROUND

This case involved the seizure of 63.13 kilograms of powder cocaine in southern Michigan on April 29, 2008. Three of the six named defendants (Rajinder Singh, Sandeep Singh, and Paramjeet Singh) pleaded guilty before trial. Defendant Dhaliwal went to trial with co-defendants Tarlochan Singh Guron and Baljit Singh on charges of conspiracy to distribute more than 5 kilograms of cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1). The trial was relatively long,[1] with more than a dozen witnesses. The Sixth Circuit Court of Appeals summarized the evidence presented in the following manner:

---

[1] The length of trial was significantly affected by the need for complete language translation, from English to Punjabi and from Punjabi to English, of all facets of the trial proceedings.

On April 28, 2008 the Department of Homeland Security, Bureau of Immigration and Customs Enforcement ("ICE"), received information from Canadian law enforcement authorities that a green semi-trailer truck bearing the company logo "GTX" may be transporting a large amount of cocaine through the United States to Canada. Based upon this information, ICE agents located the green GTX truck at a Flying J truck stop in Gary, Indiana that same night. After continuing surveillance at the Flying J through the night, ICE agents observed a white GTX semi-trailer truck arrive at the truck stop the next morning. How these GTX trucks came to be at the Flying J, what occurred at the Flying J, and what occurred after the trucks left the Flying J constitute the heart of the conspiracy charge against Dhaliwal, Baljit, and their coconspirators. Many of these facts were controverted.

Appellant Dhaliwal, the driver of the green GTX truck, testified at trial that he started receiving telephone calls from Pauma, another truck driver, while he was in Salinas, California to pick up a load of strawberries. After leaving California, Dhaliwal proceeded along the route to his next stop in Toronto, Canada. On April 27, 2008, Dhaliwal was awakened by two men knocking on the door of his truck while he slept at a truck stop in Utah. The men, who were armed, gave Dhaliwal three duffel bags full of cocaine to transport in his truck and threatened Dhaliwal's and his children's lives. After the men left, Dhaliwal received several threatening calls from Pauma. Dhaliwal testified that during these calls, he repeatedly told Pauma he would throw out the duffel bags. Dhaliwal arrived at the Flying J truck stop in Gary, Indiana on April 28, 2008. In the middle of the night, Dhaliwal tried to move his truck but discovered that his truck's air hoses were cut. Dhaliwal had his truck repaired and then went back to sleep.

Co-conspirator and co-defendant Tarlochan Singh Guron ("Guron"), the driver of the white GTX truck, testified that he received assistance from an individual named Jeswinder Singh ("Jeswinder") when he experienced problems with his truck in Montana on April 24, 2008. After getting his truck fixed, Guron made two stops in California before arriving at a Love's gas station in Utah to spend the night. The next morning, Guron noticed Dhaliwal's green truck at the Love's [gas station] and observed Dhaliwal with socks on his hands and brown-colored blocks in the truck. Guron testified that he then called his boss, Karamjit Gill (the owner of GTX trucking), and relayed his observations. According to Guron, Gill told him that what he saw may be drugs and that he should stay behind to follow Dhaliwal. Gill also informed Guron that he would call the authorities and report the drugs. Guron testified that, at the request of Gill, he followed Dhaliwal from Utah and arrived in Gary, Indiana on April 28, 2008. That night, Pauma told Guron over the phone that Dhaliwal's truck had some "stuff" in it and that Guron should let Dhaliwal put the "stuff" in Guron's truck. According to Guron, Pauma threatened him.

Appellant Baljit testified at trial that he and his wife owned a trucking business, which closed in April of 2008 due to high gas prices. Searching for new business opportunities, Baljit spoke to co-conspirator Rajinder Singh ("Rajinder") about his interest in purchasing a gas station in Indiana. Baljit testified that, in another telephone conversation on April 28, 2008, Rajinder told him that if he wanted to see the gas station then he would introduce him to a person who would be able to help. Baljit then purchased a plane ticket to travel from Seattle to Chicago, Illinois on April 28, 2008. Phone records introduced at trial showed that Baljit called Jeswinder immediately before boarding the plane in Seattle. After arriving [ ] in Chicago in the early morning of April 29, 2008, Baljit called Rajinder, rented a silver Chevy Cobalt, and drove to the Flying J in Gary, Indiana.

Rajinder testified that he received a call on April 28, 2008 from an individual named Sarbjeet Singh ("Sarbjeet") who advised him to contact Jeswinder about a plan to steal cocaine from a truck in Indiana. According to Rajinder, Jeswinder stated that the cocaine in the truck belonged to him and to four other people: Guron, Pauma, Gill, and another individual whose name Rajinder could not recall. Jeswinder asked Rajinder to steal the cocaine from the truck, thereby ripping off his other partners. Initially, Rajinder declined because he would not be able to make it to Gary, Indiana in time to intercept the truck. He later agreed to the plan when Jeswinder explained that he and Guron would delay the truck at the Flying J until Rajinder could get there. Rajinder further testified that he made arrangements for Baljit to help him steal the cocaine.

Rajinder and two other charged co-conspirators, Sandeep Singh ("Sandeep") and Paramjeet Singh ("Paramjeet"), arrived at the Flying J in Gary, Indiana at approximately 7:00 a.m. on April 29, 2008. According to Rajinder, for his role in the plan, he would be paid $20,000 to distribute among himself, Sandeep, Paramjeet, and Baljit. He and Baljit were then to split another $20,000. Rajinder also testified that Dhaliwal was to receive $25,000 for bringing the cocaine to Gary, Indiana and then an additional $15,000 to take it further. Rajinder and Baljit testified to slightly divergent versions of events after their separate arrivals at the Flying J. Rajinder testified that, after greeting Baljit in the Flying J store, they walked into the restroom together, followed by Jeswinder and Guron. In the restroom, Jeswinder introduced himself to Rajinder and introduced Guron as "Uncle Tarlochan." Rajinder testified that, according to the plan discussed in the restroom, Guron was going to ask Dhaliwal to go to the showers with him. Rajinder was to steal the cocaine from the green truck while Dhaliwal showered, and then place the duffel bags in Jeswinder's truck. Rajinder further testified that after exiting the restroom and going into the Flying J store, Baljit picked up duct tape and gloves and gave them to Paramjeet to purchase. According to Baljit's testimony, Rajinder gave the duct tape and gloves to Paramjeet to purchase.

3

Meanwhile, Dhaliwal left the Flying J in his green truck and proceeded onto Interstate 94 east. Upon discovering that the green truck was gone, Rajinder called Jeswinder, who told him to follow the green truck to exit 108. At exit 108, a garbage truck was to be waiting to take the cocaine from the green truck and to further transport the cocaine to Canada. Rajinder testified that Baljit gave him the keys to his rented silver Colbalt and told him to drive. According to Baljit, Rajinder asked for the car keys so that he could drive. Baljit sat in the back seat of the car with Paramjeet, while Rajinder drove and Sandeep sat in the front passenger seat. The silver Cobalt followed the trucks on to Interstate 94 and eventually to the Michigan Welcome Center.

Guron testified that as he was leaving the Flying J to follow Dhaliwal's green truck, Pauma called him again and asked whether Guron met "his guys" and referred to a silver car and a black car. Guron further testified that Pauma threatened him and his family. Dhaliwal testified that sometime after leaving the Flying J, he received a call from Guron, who told him that he would take the bags from him at the Michigan Welcome Center. Dhaliwal pulled into the Michigan Welcome Center ahead of Guron. When Guron pulled into the Michigan Welcome Center, he parked next to Dhaliwal's green truck. After looking around, Guron opened the window of his truck and Dhaliwal threw the duffel bags inside.

Guron then left the Michigan Welcome Center in the white truck, followed by Dhaliwal in the green truck. As Dhaliwal was leaving the welcome center, the silver Cobalt pulled in front of him and blocked the interstate ramp. Rajinder, whom Dhaliwal did not know at the time, got out of the car and approached the green truck. To confirm that the duffel bags were no longer in the green truck, Rajinder stepped up onto the truck and looked inside. When Rajinder returned to the car, they started to once again follow the white and green trucks along Interstate 94. When Rajinder got close enough to the white truck, he recited its trailer number and company number on the phone to Jeswinder. Jeswinder confirmed that it was Guron's truck. Baljit testified that he did not know what was going on, but that Rajinder was angry and was talking on the phone about "beating and violence." According to Baljit, Rajinder told him that, "We will help you and we will take you to [ ] Detroit. But do not interfere in our work." Baljit maintained that he was merely an innocent bystander in the events of April 29, 2008.

During the course of surveillance on Interstate 94, the ICE agents noticed that a silver Cobalt seemed to be following the green and white trucks. After observing the exchange take place at the Michigan Welcome Center, where the duffel bags from the green truck were transferred to the sleeper compartment of the white truck, the ICE agents continued to follow the green and white trucks along Interstate 94. Eventually, all three vehicles were pulled over with the help of the Michigan State Police. After Guron consented to a search of the white truck, officers discovered three duffel bags containing a total of 63.3 kilograms of cocaine. Dhaliwal, Baljit,

4

> Guron, Rajinder, Sandeep, and Paramjeet were all arrested and charged with conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1).
>
> At trial, the government presented border entry information showing that four of the six defendants entered the United States from Canada during a two-day period: Guron entered the United States on April 22, 2008 at Sweetgrass, Montana; Baljit entered on April 23, 2008 at Blaine, Washington; Rajinder entered on April 23, 2008 at Buffalo, New York; and Dhaliwal entered on April 23, 2008 at Orville, Washington. Phone records introduced at trial showed that Guron and Dhaliwal had frequent telephone contact with each other in the days leading up to April 29, 2008. Guron and Dhaliwal each had frequent telephone contact with Pauma and Jeswinder. Based on an examination of phone records, an ICE agent testified that Guron, Dhaliwal, and Jeswinder traveled "in sync" from California to Gary, Indiana.

(Dkt 350 at 1-7) (footnotes omitted). A jury convicted Defendants Guron and Dhaliwal on September 30, 2008 (Dkts 155 & 156). The jury returned a verdict against Defendant Baljit Singh on October 1, 2008 (Dkt 158).

On April 13, 2009, the Court sentenced Defendant Dhaliwal to 180 months in prison to be followed by 5 years on supervised release. On April 16, 2009, the Court entered its Judgment (Dkt 200), from which Defendant filed a Notice of Appeal (Dkt 201).

On April 15, 2009, before his sentencing, Defendant Guron filed a Motion for a New Trial, arguing that the government breached its obligations under *Brady v. Maryland,* 373 U.S. 83 (1963), in failing to provide certain information he opined would have corroborated his position at trial (Dkt 196). The government filed a response on May 22, 2009, indicating that it determined that it had been "in possession of information which may have corroborated the claim of this defendant that he presented at trial, that he himself provided the information which led to his arrest and this Indictment" (Dkt 236). The government acquiesced in the relief requested and further indicated that, once a new trial was granted, the government would move to dismiss the Indictment against

5

Defendant Guron (*id.*). The Court granted the uncontested motion for new trial (Dkt 238) as well as the government's uncontested motion to dismiss the Indictment as to Defendant Guron (Dkt 245).

On May 29, 2009, Defendant Dhaliwal filed a "Rule 33 Motion for New Trial," arguing that he is "equally entitled to a new trial as a consequence of the government's intentional suppression of exculpatory evidence" (Dkt 246 at ¶ 7). On June 3, 2010, this Court entered an Order, declining to certify during the pendency of Defendant's appeal that it would grant his motion (Dkt 311).

On March 13, 2012, the Sixth Circuit Court of Appeals affirmed the convictions of Defendants Dhaliwal and Baljit Singh. *United States v. Dhaliwal*, 464 F. App'x 498 (6th Cir. 2012). The Sixth Circuit dismissed Defendant Dhaliwal's *Brady* claim and his related claim of prosecutorial misconduct because "there is no district court ruling for this court to review." *Id.* at 504. The Sixth Circuit indicated that Defendant Dhaliwal could reassert his motion, under Rule 33, when the case returned from the Court of Appeals. *Id.* (citing *United States v. Blanton*, 697 F.2d 146, 148 (6th Cir. 1983)).

In contrast, the Sixth Circuit ruled on Defendant Baljit Singh's *Brady* claim because he had not filed a motion for new trial in this Court. The Sixth Circuit held that Defendant Baljit Singh's *Brady* claim failed because "[u]ltimately, Baljit cannot establish a basis for his claim that the materials in the government's possession are material evidence because whether or not Guron called Karamjit Gill and reported the drugs is unrelated to Baljit's role in the conspiracy." *Id.* at 506-07. The Sixth Circuit concluded that "there was no violation of Baljit's constitutional rights under *Brady* and it is not necessary to remand the case for an in camera examination of the material in the possession of the government." *Id.* at 507. The Sixth Circuit found the remaining issues presented

6

were "meritless" and issued its mandate on April 4, 2012 (Dkt 352). Defendant has since reasserted his Rule 33 motion (Dkt 357), to which the government filed a response in opposition (Dkt 360).

## II. ANALYSIS

### A. Motion Standard

Federal Rule of Criminal Procedure 33(a) provides the following:

**(a) Defendant's Motion.** Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

**(b) Time to File.**

> **(1) Newly Discovered Evidence.** Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

> **(2) Other Grounds.** Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

To obtain a new trial on the basis of newly discovered evidence, a defendant generally must establish: "(1) the new evidence was discovered after the trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal." *United States v. Jones*, 399 F.3d 640, 648 (6th Cir. 2005) (quoting *United States v. O'Dell*, 805 F.2d 637, 640 (6th Cir. 1986)).

The standard is different when a motion for new trial is based on a *Brady* violation. *United States v. Hanna*, 661 F.3d 271, 298 (6th Cir. 2011). "[W]hen the defendant asserts that the new evidence at issue is exculpatory evidence which the government failed to turn over in violation of *Brady*, he 'should not have to satisfy the severe burden of demonstrating that newly discovered

7

evidence probably would have resulted in acquittal.'" *United States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997) (quoting *United States v. Agurs*, 427 U.S. 97, 111 (1976)). "Rather, the defendant must show only that the favorable evidence at issue was 'material,' with 'materiality' defined according to opinions interpreting the *Brady* doctrine." *Id.* (citing *O'Dell*, 805 F.2d at 641). "[T]he test of materiality depends on the nature of the evidence and the type of request made by the defense in the attempt to discover the exculpatory evidence before trial." *O'Dell*, 805 F.2d at 641.

Under both standards, the burden of proving that a new trial should be granted is on the defendant. *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994) (citing *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991)). Further, "[m]otions for a new trial based on newly discovered evidence should be granted with caution." *Seago, supra* (citing *O'Dell*, 805 F.2d at 640 ("Motions for a new trial are disfavored ..."); and CHARLES ALAN WRIGHT, FED. PRACTICE & PROCEDURE § 557 at 315 (1982) ("No court wishes a defendant to remain in jail if he has discovered evidence showing that he is not guilty, but after a man has had his day in court, and has been fairly tried, there is a proper reluctance to give him a second trial.")).

**B. Discussion**

Defendant's motion for a new trial requests this Court to address (1) a purported *Brady* violation, and (2) alleged prosecutorial misconduct in the form of improper witness intimidation and/or improper rebuttal argument (Dkt 358 at 3-4).

**1.    *Brady* Violation**

"*Brady v. Maryland* requires disclosure of evidence by the prosecution when it is both favorable to the accused and "material either to guilt or to punishment." *Hanna*, 661 F.3d at 296 (quoting *Brady*, 373 U.S. at 87). *Brady* violations have the following three elements:  "[1] The

8

evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] the evidence must have been suppressed by the State, either willfully or inadvertently, and [3] prejudice must have ensued." *Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)).

However, "there is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source." *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007) (citing *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)). "'*Brady* is concerned only with cases in which the government possesses information which the defendant does not.'" *Id.* (citing *Carter, supra*) (quoting *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994)).

Here, Defendant argues that the government "may very well have withheld *Brady* material" (Dkt 358 at 10). Defendant concedes that "it is not clear whether the alleged *Brady* violation was specifically the phone records (of Karmjit Gill) produced through pleadings filed by Guron's attorney" (*id.* at 5). Acknowledging that he bears the burden of proving that a new trial should be granted, Defendant requests an evidentiary hearing "to build a complete record regarding the alleged *Brady* violation" (*id.* at 10). The Court agrees with the government that Defendant's "*Brady* claim" amounts to nothing more than Defendant's complaint that the government has still not disclosed the raw materials in its possession corroborating Guron's testimony that he reported the drugs to Gill, who, in turn, contacted the authorities (Dkt 360 at 7).

Moreover, contrary to Defendant's assertion that his "trial counsel would not have reason to believe that Guron's actions and subsequent actions (calling their boss and asking him to report this to the authorities) occurred (until after Guron's testimony)" (Dkt 358 at 17), the essential facts

9

permitting Defendant to take advantage of the information in question were part of the trial record as early as August 26, 2008, several weeks before trial began on September 16, 2008. On August 26, 2008, co-defendant Guron, in his request for a jury instruction on coercion/duress, revealed the following:

> Mr. Guron encountered another employee in the State of Utah from the same trucking company known to him as "Goldie" (and later identified as Co-Defendant Dhaliwal) where he acted nervous and saw in his truck for the first time, three duffel bags of what appeared to be drugs. Mr. Guron at that time acted responsibly and contacted his employer, Mr. Gill of Gooroo Express Company (GTX of Toronto, Canada), who then began a "GPS-track" of the route "Goldie" was following and noticed that there was a deviation from the route he was supposed to travel. Apparently at that time, coupled with Mr. Guron's information, Mr. Gill then contacted [ ] Canadian law enforcement to report a possibility that Goldie was transporting drugs using the Gooroo Express Company (GTX) semi tractor.

(Dkt 79 at 6-7).

Given that Defendant had the information in advance of trial, the Court determines that, under the applicable case law, no *Brady* violation occurred. As the Sixth Circuit has observed, in cases where the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source, there is no *Brady* violation because "there is really nothing for the government to disclose." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998).

Because no *Brady* violation occurred, Defendant Dhaliwal must meet the usual four-part test in order to succeed on his Rule 33 motion. *See O'Dell*, 805 F.2d at 640. Here, Defendant Dhaliwal fails to meet prongs three and four. Specifically, Defendant Dhaliwal fails to show how any such evidence corroborating Guron's report to Gill, even if somehow favorable to Dhaliwal, is material or would likely produce an acquittal.

The uncontested evidence at trial demonstrated that Defendant Dhaliwal knowingly transported the cocaine from at least Utah to Michigan, where he transferred the cocaine to co-defendant Guron. Defendant emphasizes that both he and Guron "asserted the defenses of duress" and therefore "the evidence and/or information not disclosed to any of the defendants is as applicable to him as it was to Guron" (Dkt 358 at 8). However, any evidence corroborating Guron's report to Gill was immaterial to at least three of the elements of a duress defense, to wit: whether Defendant Dhaliwal "was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury;" whether he had "no reasonable, legal alternative to violating the law;" and whether he did not maintain the illegal conduct "any longer than absolutely necessary." *See United States v. Johnson*, 416 F.3d 464, 468 (6th Cir. 2005) (delineating elements). As the government points out, if the evidence is insufficient as to any element of the defense of duress, then the defense fails as a matter of law (Dkt 360 at 14, citing *Johnson, supra*).

Moreover, the government properly asserts that the duress defense of Defendant Guron, who claimed to have informed his employer of the drugs, was very different from the duress defense of Defendant Dhaliwal, who claimed he was forced to carry the drugs for several days over thousands of miles while alone in his truck with access to his cell phone (Dkt 360 at 12-13). Indeed, as the government further asserts, because Guron's contact with Gill took place days before Guron took possession of the drugs, it is questionable to what extent Guron's call to Gill bolsters even Guron's claim of duress, let alone Dhaliwal's less plausible claim of duress (*id.* at 12). Therefore, the Court is also not convinced that Defendant has demonstrated that any such evidence corroborating Guron's report to Gill was likely to result in the jury acquitting him of the cocaine conspiracy offense.

In sum, Defendant has not revealed a *Brady* violation where the essential facts permitting him to take advantage of the information in question was available to him, nor has Defendant borne his burden of proving the interests of justice require granting him a new trial.

**2.     Prosecutorial Misconduct**

Defendant's prosecutorial misconduct claim has two components: (a) his argument that the government improperly pressured Karamjit Gill not to testify at trial, and (b) his argument that the prosecutor improperly commented during rebuttal argument on the failure of Guron and Dhaliwal to present Gill as a witness to corroborate their version of events. Because the prosecutorial misconduct claim does not raise a *Brady* claim, it is governed by the more stringent four-part test for deciding whether to grant a new trial. *See Frost, supra.*

a.     *Witness intimidation*

Defendant includes in his supporting brief a lengthy excerpt of a transcript purportedly of a telephone conversation between Gill and Guron's trial counsel on March 12, 2009, more than five months after trial (Dkt 358 at 12-15). Defendant opines that the transcript reveals that the government improperly intimidated Gill so that he would not be available to testify at trial, thereby violating Defendant's due process rights (Dkt 358 at 15-16, citing *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997)).

The Supreme Court has expressly recognized that a party's right to present his own witnesses in order to establish a defense is a fundamental element of due process. *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997) (citing *Washington v. Texas*, 388 U.S. 14, 19 (1967)). "Government misconduct that amounts to substantial interference with a witness' free and unhampered determination to testify may be deemed a violation of due process." *United States v. Clark*, 319 F.

12

App'x 395, 404 (6th Cir. 2009) (citing *Foster, supra*). "Such misconduct amounting to witness intimidation will not justify a new trial, however, unless the defendant demonstrates that it was not harmless." *Id.* (citing *Foster, supra,* and *United States v. Stuart*, 507 F.3d 391, 398 (6th Cir. 2007)). *See also Bank of Nova Scotia v. United States*, 487 U.S. 250, 255-56 (1988) (holding that alleged prosecutorial misconduct during grand jury proceedings, including allegations of witness intimidation, was subject to harmless error analysis); *United States v. Hasting*, 461 U.S. 499, 508-09 (1983) (rejecting automatic reversal without regard to prejudice where constitutional error occurs).

Gill was Defendant's employer and therefore not unknown to him. As indicated *supra,* the information corroborating Guron's contact with Gill was similarly not unknown to Defendant before trial. Nonetheless, Defendant Dhaliwal has not asserted that he attempted to call Gill as a witness at trial. Rather, Defendant instead asserts only that Gill, "whether he ultimately testified for either Guron or Dhaliwal, would have helped both in their presentations of their defense of duress" (Dkt 358 at 16). Assuming arguendo that Defendant may properly claim a due process violation arising from intimidation of a witness he does not concomitantly claim to have even called, Defendant's argument fails on the prejudice prong. For the reasons stated more fully in rejecting Defendant's purported *Brady* claim, Defendant has not demonstrated that Gill's import to his particular duress defense was likely to result in an acquittal.

Therefore, even assuming arguendo that Defendant could prove that the government substantially interfered with Gill testifying at trial, Defendant has not shown that the witness intimidation resulted in any actual prejudice to his right to a fair trial. Accordingly, under the applicable case law, Defendant's governmental interference argument likewise fails to satisfy his burden of proving that the interests of justice require a new trial.

b. *Rebuttal argument*

Last, Defendant argues that this Court should grant him a new trial because of certain remarks the prosecutor made during rebuttal argument at trial. During his closing argument, Defendant's trial attorney asserted that Gill "apparently" had instructed Guron to "[s]tay away" from Dhaliwal, because "[h]e could be killed" (Trial Tr. IX at 1338 [Dkt 278 at 56]). In response, the prosecutor during rebuttal posed the following query: "[i]f Karam Gill is the employer of both Tarlochan Singh Guron and Surinder Singh Dhaliwal, wouldn't he be able to verify the parts of the stories told by these two men?" (Trial Tr. IX at 1382 [Dkt 278 at 100]). Neither side objected to the other's argument. In his motion at bar, Defendant opines that "both Guron and Dhaliwal were made to look like liars and their defense destroyed by making the defendants' testimony look like lies and that there was nothing to back up what they had been saying" (Dkt 358 at 8-9).

A prosecutor's remarks during rebuttal must be viewed in context. *See, e.g., United States v. Carter*, 236 F.3d 777, 789 (6th Cir. 2001); *United States v. Mejorado-Soto*, No. 94-2404, 73 F.3d 363, at *3 (6th Cir. 1995); *United States v. Brickley*, Nos. 90-5182, 90-5183, 916 F.2d 713, at *3 (6th Cir. 1990). "Case law permits comments that are made in response 'to the argument and strategy of defense counsel.'" *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (quoting *Butler v. Rose*, 686 F.2d 1163, 1172 (6th Cir. 1982) (en banc)). Here, the Court is not convinced that Defendant's argument warrants a new trial where the prosecutor's query was an invited response to defense counsel's claim during closing argument. Moreover, given this Court's analysis thus far, the prosecutor's query did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal marks and citation omitted).

## III. CONCLUSION

For the foregoing reasons, Defendant's Motion for New Trial (Dkt 357) is denied.


DATED: February 22, 2013         /s/ Janet T. Neff
                                JANET T. NEFF
                                United States District Judge